Filed 1/16/26  In re C.S. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re C.S., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br> v.<br><br>C.S.,<br><br>   Defendant and Appellant. | C103248<br><br>(Super. Ct. No. JV138769) |

C.S. appeals from an order transferring him from juvenile court to adult criminal court to face charges for murder.  He argues (1) the juvenile court committed prejudicial error by asking the sheriff's department, on an ex parte basis, for information about his behavior in county jail, and (2) the court's ultimate finding that he is not amenable to rehabilitation while under its jurisdiction is not supported by substantial evidence.  We disagree and thus affirm.

1

## LEGAL BACKGROUND

We begin with some legal background in order to provide context for the factual and procedural background that follows. A minor between the ages of 12 and 17 is "within the jurisdiction of the juvenile court" when he or she violates any law of this state. (Welf. & Inst. Code, § 602.) However, if a minor is charged with a felony that was committed when he or she was 16 or older, the prosecutor "may make a motion to transfer the minor from juvenile court to a court of criminal jurisdiction." (Welf. & Inst. Code, § 707, subd. (a)(1).) Welfare and Institutions Code section 707 sets forth the procedures a court must follow when ruling on such a motion.[1]

It provides the juvenile court "shall order the probation officer to submit a report on the behavioral patterns and social history of the minor." (§ 707, subd. (a)(1).) "Following submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction. In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3).) In making its determination, the court "shall consider" the following five criteria or factors: (1) "[t]he degree of criminal sophistication"; (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction"; (3) "[t]he minor's previous delinquent history"; (4) the "success of previous attempts by the juvenile court to rehabilitate the minor"; and (5) "[t]he circumstances and gravity of the offense alleged." (*Ibid.*) The prosecution bears the burden of proving the minor should be transferred. (Cal. Rules of Court, rule 5.770(a).) If the court orders the minor

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

transferred, it "shall recite the basis for its decision in an order entered upon the minutes, which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3).)

Because the ultimate determination is whether the minor "is not amenable to rehabilitation while under the jurisdiction of the juvenile court" (§ 707, subd. (a)(3)), the court's "analysis of the five criteria . . . should be focused through the lens of amenability to rehabilitation." (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1288.) That does not mean, however, that the second criterion—i.e., whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction—is necessarily the most important one in determining whether to grant a transfer motion. (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 166 (*Miguel R.*).) Instead, "according to the statute's plain language, the court is required to consider each of the five listed criteria in determining whether the prosecution has carried its burden of proof to transfer a juvenile to criminal court. [Citation.] 'Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction' is the second of the five listed criteria. [Citation.] The statute does not direct the juvenile court to afford any greater weight to that criterion. [Citation.] Rather, the statute expressly requires the court to consider all five criteria in making its determination, but the statute says nothing about the relative weight to be given to any of the criteria." (*Ibid.*) "The weight to be given each of these factors [or criteria] is [thus] within the court's discretion." (*D.W. v. Superior Court* (2019) 43 Cal.App.5th 109, 116; see also *In re E.P.* (2023) 89 Cal.App.5th 409, 417 ["the court has the discretion to conclude that one or more of the five factors predominate so as to determine the result, even though some or all of the other factors might point to a different result"]; *Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 186 [" '[n]othing in section 707 indicates that the . . . court [is] required to give equal weight

to each of the five criteria or that it would necessarily be an abuse of discretion to find that one criterion outweighed the other criteria' "].)

## FACTUAL AND PROCEDURAL BACKGROUND

In early 2023, a juvenile wardship petition was filed charging C.S. with the murder of Salvador Doe (the victim) and further alleging C.S. personally and intentionally used a firearm in the commission of the offense. C.S. was approximately three months shy of his 18th birthday at the time. The People filed a motion to transfer the case to criminal court, and an evidentiary hearing was held in January 2025.

As required by section 707, the probation department submitted a report on C.S.'s behavioral patterns and social history (the transfer report). The prosecutor submitted 32 documents containing evidence about the current charges, C.S.'s behavior in the youth detention facility since being detained on the current charges, and his prior delinquent history. These documents included the various police reports, juvenile petitions, court orders, probation reports, etc., and all were admitted into evidence without objection. The prosecutor also asked the court to take judicial notice of the court files. C.S. submitted a psychological evaluation prepared by Dr. Carolyn Murphy, an expert in forensic psychology and the evaluation of juveniles, and a social history prepared by Tonya Jacobs, a forensic social worker.[2] Dr. Murphy and Jacobs both testified at the hearing. C.S. also submitted several probation reports and a competency evaluation prepared in 2021.

The evidence showed the following.

---

[2] As noted, section 707 requires the probation department to prepare a report on the minor's social history. (§ 707, subd. (a)(2).) The social history prepared by Jacobs covers many of the same subjects as the probation department's transfer report.

*The Current Offense*

Late on the evening of January 1, 2023, police were dispatched to a Sacramento apartment complex following reports of a shooting. When they arrived, they found the victim lying unresponsive on the ground with a gunshot wound to his chest. The victim was pronounced dead at the scene, and an autopsy determined the gunshot wound was the cause of death.

The victim's brother, who was present at the scene, told police he and the victim had driven from Stockton to Sacramento to sell an AR-15 rifle to a prospective buyer. According to the brother, the victim and the buyer had discussed the sale over social media. The brother told police he and the victim met with a male approximately 17 years old (the suspect) outside the apartment complex. The victim and the suspect agreed on a purchase price of $1,500, and the suspect told the victim to park the vehicle and proceed on foot down a walkway to complete the transaction. The victim parked, exited the vehicle with the rifle, and followed the suspect down the walkway. As the victim and the suspect were walking around a building, the brother heard two gunshots. The victim dropped the rifle, ran back towards the vehicle, and collapsed on the ground. In the meantime, the suspect picked up the rifle and fled on foot through the apartment complex.

Security footage from the complex showed a male matching C.S.'s description walking alone through the complex and later running through a gate holding what appeared to be the rifle case described by the victim's brother.

Detectives obtained the victim's social media records showing the conversation with the suspect regarding the sale of the rifle, and from those social media records were able to identify C.S. as the person with whom the victim was conversing. C.S.'s social media records only contained messages from the victim, leading detectives to believe C.S. deleted the messages he sent to the victim from his account.

5

C.S.'s social media records showed he messaged five other people on the day of the shooting and said he was going to rob someone. In two separate message threads he stated, " 'I just need somebody to grab the chop when I'm upping on him.' " In these messages C.S. provided a residential address located a short distance from the shooting, and video surveillance from that area showed C.S. exiting the residence before the shooting wearing the same clothing seen on the video from the apartment complex and later returning to the residence carrying what appeared to be a rifle case.

*Prior Delinquent History*

(a) 2017 robbery

In June 2017, C.S. was arrested in Sacramento for robbery and cruelty to an elder causing great bodily injury. According to police reports, he and another boy approached a 92-year-old woman, grabbed her purse, and pushed her to the ground.[3] He was 12 years old at the time. A juvenile petition was filed, but in August 2017, he was found incompetent and proceedings were suspended.[4] He began seeing Maria Tejada from

---

[3]  The woman died approximately six weeks after the robbery. The woman's granddaughter reported the woman had broken her hip when she was pushed to the ground and she never recovered. It appears C.S. was not charged with the woman's death.

[4]  Section 709 provides a minor is incompetent "if the minor lacks sufficient present ability to consult with counsel and assist in preparing the minor's defense with a reasonable degree of rational understanding, or lacks a rational as well as factual understanding of the nature of the charges or proceedings against them. Incompetency may result from the presence of any condition or conditions, including, but not limited to, mental illness, mental disorder, developmental disability, or developmental immaturity." (§ 709, subd. (a)(2).) In Dr. Murphy's opinion, C.S. did not have a mental illness and was not developmentally disabled, and the only reason he was found incompetent was because he was developmentally immature, and "with some education and maturity, when he was older, he had no difficulty passing the competency assessment."

Dignity Health for "competency restoration."[5]

In March 2018, Tejada informed the probation department that C.S. was scheduled to meet with her weekly, but he had missed many sessions. She stated they were working on building coping skills and processing his trauma, and she utilized "a lot of play therapy." She also stated, "he is very engaged and participates in the counseling." In June 2018, C.S.'s father informed the probation department that he had been unable to take C.S. to his appointments with Tejada because he had been sick and there was no one else available to take him. Tejada told the probation department C.S. had recently been "discharged from counseling services" because he and his father "had a history of attendance issues."

In September 2018, the juvenile court ordered that C.S. be re-evaluated for competency, but no doctors were available to be appointed at the time. C.S. was finally re-evaluated in February 2019, and once again found incompetent.

(b) February 2019 robbery

In February 2019, C.S. was again arrested in Sacramento for robbery. This time, he and three other boys grabbed a woman's backpack, took money out of it, kicked her, and fled. He was not quite 14 at the time. A juvenile petition was filed, and at a hearing on both the new petition and the prior petition, the juvenile court noted C.S. was "presently incompetent" to stand trial and the proceedings would remain suspended. The

---

**5**     It appears C.S. had been receiving counseling at Dignity Health prior to being found incompetent because the August 2017 competency evaluation noted he had been "in counseling at Dignity Health over the prior two years." And according to Tonya Jacobs's report, "The records reflect that [C.S.] was receiving mental health services through Dignity Health on and off from 2011-2018. He and his father both reported that he started counseling due to anger issues in school, however, there were other issues going on in the home and it was reported there was 'parent/child conflict' as well."

court also referred him to the juvenile justice diversion and treatment program.[6] The probation department was directed to identify services available to restore his competency, and in May and June, it reported that no such services were currently available in Sacramento County and there were no out-of-home placements available in California.

It is not clear how the 2017 and February 2019 petitions were ultimately resolved. According to a juvenile intake report prepared in 2021, they were dismissed in July 2019 for insufficient evidence; according to the transfer report, they were dismissed in March 2021, but no reason is given.

(c) September 2019 attempted robbery

In September 2019, C.S. was arrested in Sacramento for attempted robbery after he and two others approached a woman and tried to grab her phone. He was now 14 and a half years old. A petition was filed, and at the detention hearing on the new charges, doubt about his competency was declared. He was re-evaluated and again found incompetent. In October, he was released to his father on electronic monitoring, and, shortly thereafter, a motion to modify his custody status was filed after the probation department reported he was smoking marijuana and leaving the house without his father's knowledge, and he had been out of electronic monitoring range for 77 hours without permission. The juvenile court directed the probation department to determine what services were available to C.S. and his family, and it reported services were not available in Sacramento County because C.S. and his family lived in San Joaquin County. It also reported that San Joaquin County had made a referral for "wraparound" services and had

---

[6]     According to Tonya Jacobs's report, "he was referred to River Oak JJDTP through probation [in] 2019, however, the location of services became problematic because the father had relocated to Stockton," and the services were in Sacramento.

assigned a "family advocate," and the advocate had met with C.S.'s father and would assist with finding C.S. a therapist.

According to the transfer motion, because services were in place for C.S. and his family in San Joaquin County, the district attorney's office agreed to dismiss the petition. According to the transfer report, the matter was dismissed in December 2019 for insufficient evidence.

(d) 2020 possession of a firearm

In May 2020, C.S. was arrested in Sacramento for possession of a firearm. While monitoring social media, law enforcement observed C.S. holding a handgun while live streaming. When he was arrested, police found the handgun in the vehicle he was in; the handgun had a live round in the chamber and a 17-round capacity magazine. C.S. was 15 years old at the time. According to the transfer motion, the case was rejected by the Sacramento County District Attorney's Office and referred to the San Joaquin County District Attorney's Office because C.S. lived in San Joaquin County. According to the transfer motion, no charges were filed in San Joaquin County.

(e) 2021 possession of a firearm

In February 2021, C.S. was again arrested in Sacramento for possession of a firearm. Once again, law enforcement was monitoring social media and observed him holding multiple handguns with loaded magazines, including one with an extended magazine, while live streaming. C.S. was not quite 16 years old. A petition was filed charging him with two counts of possession of a firearm (one for the May 2020 arrest and one for the February 2021 arrest), and one count of possession of live ammunition. At counsel's request, the court ordered an evaluation of C.S.'s competency, and this time, he was found competent.

In March, C.S. admitted one of the possession counts, the other two counts were dismissed, and he was released to his father on home supervision. Because he lived in

9

San Joaquin County, the case was transferred there for disposition, and in August, he was granted deferred entry of judgment (DEJ) and placed on probation.

(f) 2022 possession of a firearm

In February 2022, C.S. was again arrested in Sacramento for possession of a firearm. On this occasion, as police approached C.S. walking away from a vehicle, they heard the sound of a firearm hitting the ground. Police recovered the firearm; it was loaded, had a magazine containing 15 live rounds, and had been reported stolen. C.S. was almost 17 at the time. Another petition was filed charging him with three counts involving possession of a firearm. His DEJ was terminated due to the new charges. He admitted one of the counts, and the other two were dismissed. Once again, the case was transferred to San Joaquin County for disposition.

In April, the San Joaquin County Juvenile Court prepared a disposition report noting C.S. "is headed down a destructive path and stronger sanctions are needed to curb his behavior" and recommending 180 days in juvenile hall. It is not known whether this recommendation was adopted, although the transfer report notes he was adjudged a ward of the court and he spent 54 days in San Joaquin County juvenile hall.

In August, C.S.'s father reported he had left home without permission and his whereabouts were unknown, and a warrant was issued for his arrest.

In October, C.S. and his family were referred to "Family Vision Wraparound Services" to "assist the youth with making better choices." Notes from the provider state C.S. and his family "seemed to be hesitant to services" because they "seemed to be too demanding for the family at the time." The provider was nonetheless "able to identify the area of need and how services could assist," but C.S. "often missed scheduled appointments due to having strong ties out of town," and his father "often could not meet due to his work schedule." The provider "also attempted to open IFS mental health services, but youth declined services."

In January 2023, C.S. was arrested for the murder of Salvador Doe.

*Family and Social History*

It is not disputed that C.S. had a traumatic childhood. His mother had a long history of drug use and criminal convictions. She died in 2018, when C.S. was around 13. His father had a cognitive disorder and had been receiving Alta Regional Services since he was a teen.[7] The year C.S. was born, child protective services (CPS) substantiated several allegations of neglect involving both his parents, and he was removed from the home for an unknown amount of time. All told, C.S.'s family was the subject of almost 40 CPS referrals. Tonya Jacobs, who used to work for CPS, testified that such a high number of referrals told her "this was a family . . . in crisis." CPS reports documented that C.S.'s parents had a history of domestic violence, his two sisters had been sexually molested by a relative, and C.S. had reported both parents physically abused him and he had attempted to hang himself on three occasions.[8]

C.S. lived primarily with his father and sisters throughout his childhood. When he was 10 or 11, the family moved to an area in Sacramento known for crime, violence, drugs, and gangs, and when he was 15, the family moved to an area in Stockton that was also known for guns and violence.

C.S. reported his father "did his best to provide for the family; however, money was often short, and [he] felt that he had to provide for himself." He reported he was often unsupervised and would leave home without permission. He admitted daily marijuana use beginning around the age of 13. He told Jacobs he used marijuana because he was "stressed out" and did not want to "think about his problems." He also told

---

[7]    Such services are available to people with development disabilities. (See *Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 487-488.)

[8]    One of his sisters told Jacobs she witnessed one such attempt.

Jacobs he started carrying a gun because "I was selling marijuana and I didn't want to get robbed."[9]

C.S. had trouble regulating his behavior at school, was frequently suspended due to physical altercations, and was expelled at some point. He was chronically absent, and it appears he simply stopped attending school during the COVID-19 pandemic and never returned (although he graduated from high school while detained in juvenile hall for the current offense). He was diagnosed with attention deficit hyperactivity disorder (ADHD) when he was around 13, however Dr. Murphy questioned the diagnosis and thought he may simply have been "exhibiting signs of emotional dysregulation secondary to . . . exposure" to adverse childhood experiences.

*Behavior, Criminal Charges, and Services in Detention*

While detained in juvenile hall for the current offense, C.S. was the subject of over 70 incident reports documenting negative behavior, including gambling, disrespect, noncompliance with staff directives, aggression, violence, and encouraging other detainees to commit acts of violence. Dr. Murphy acknowledged she had reviewed and was aware of these incident reports.

In November 2024, C.S. was charged as an adult with felony assault on another detainee. Security footage from juvenile hall showed C.S. walk up to the other detainee and hit him multiple times in the face. The other detainee sustained a deep laceration to his lip that required stitches. The attack occurred just one week before the transfer hearing was initially scheduled to begin.

C.S. participated in numerous programs while detained for the current offense, including Gang Awareness Prevention, Reaching Back to Our Youth, Boys and Girls Club, Alternatives to Violence, Life Skills, Anti-Recidivism Coalition, and a mentor

---

[9]     C.S. told Dr. Murphy he started carrying a gun when he was 15 because he witnessed gun violence on the streets and did not want to be victimized.

program. According to one of the above-mentioned incident reports, however, Boys and Girls Club staff complained C.S. was disruptive and disrespectful and asked that he be removed from participation.

Jacobs testified C.S.'s poor behavior in detention did not surprise her because "[h]e's been modeled violence his entire life, and he has not really had a meaningful opportunity and treatment to work on those issues with his anger. And what we know about rehabilitation is [it is] not linear. It has setbacks and progress."

*Dr. Murphy's Testimony*

Dr. Murphy was retained by C.S.'s attorney to evaluate C.S. and determine whether he was amenable to rehabilitation. She holds a Ph.D. in psychology and specializes in forensic psychology and the evaluation of juveniles, and the juvenile court accepted her as an expert in these areas. She testified that, in her opinion, C.S. is amenable to treatment.

Dr. Murphy testified about the brain's prefrontal cortex and its effect on behavior. She called this part of the brain the "control center" and explained it is responsible for "inhibition of impulses, executive planning, and organization." It begins developing during puberty and does not fully develop until the mid to late 20s, and its development can be delayed by adverse childhood experiences of the kind C.S. suffered. She testified C.S. (who was almost 20 at the time of the hearing) would experience "a lot of growth and development in the next six years."

She was asked what services C.S. needed in order to be rehabilitated and she responded, "He needs . . . anger management, trauma work, attachment work. I think he needs to be reassessed to see if the ADHD requires medication or changes in treatment because there are executive functioning deficits in ADHD . . . . [¶] I think he also needs . . . vocational training, things to aspire to completely reshape and change his life. He knows robbing people, playing dice and gambling because he did that when he was a kid on the streets. This is the life he knows. This is the life he was exposed to. [¶] So

13

exposing him to and helping him learn to adjust to a different type of life. A different type of having fun. A different type of achievement and pride and accomplishment is what he needs." She did not know what rehabilitative programs were available in juvenile hall, but in her opinion, "[i]f they don't currently have what he needs, they need to get it."

She was asked whether it was "possible to opine as to how much time is needed to effectively rehabilitate someone," and she responded, "No. It's really difficult. I'm always an advocate for let's use the time we have and use all of it to make sure that all aspects of a person's functioning are being addressed in treatment, but there really isn't any way to say this person is two years, three years. We don't know." She was also asked whether it was "possible that he could need longer than the age of 25 to be rehabilitated," and she responded, "I can't say that it's not, but I do believe that with the right assessments and the right intensive treatment, it is enough time, but I don't have a crystal ball, and it is possible to take longer, yes."

She testified competency restoration services are different than rehabilitative services. The purpose of competency restoration is to enable a minor to meaningfully participate in the court process, which "has really nothing to do with rehabilitation." She acknowledged she did not know what rehabilitative services C.S. received in San Joaquin County after the firearms charges were sustained, but she did not see evidence "that there was a comprehensive psychological evaluation or an identified program of services that was going to address the underlying reasons behind the delinquent conduct." She also acknowledged the records she reviewed noted C.S. "would decline to do this or wouldn't do that. But he's a child, and we need to make him do things." Finally, she testified that any prior counseling or services he received (i.e., prior to the current charges) would not have any bearing on his current amenability to rehabilitation because he was "at a different development stage" then. Counseling at a young age involves "talking about feelings, play therapy, drawings. You're not doing the same type of treatment that you

14

would do now at this stage. It would be completely apples and oranges." "He's now a young man and emerging adult. He's not a teen anymore. . . . The treatment would be very different now."

*The Juvenile Court's Decision*

The juvenile court granted the motion to transfer C.S. to criminal court. In explaining the basis for its decision, it began by noting, "[t]he district attorney has the burden of showing by clear and convincing evidence that [C.S.] is not amenable to rehabilitation while under this Court's jurisdiction," and that it was required to consider "a number of factors focused through the lens of amenability to rehabilitation." It then proceeded to discuss the five factors (or criteria) identified in section 707.

*Degree of criminal sophistication.* The court found C.S.'s conduct before, during, and after the shooting demonstrated a high degree of criminal sophistication. It noted he set up the gun purchase on social media and selected the location of the sale. He planned to rob the victim, as evidenced by messages he sent to others prior to the shooting. He lured the victim away from the victim's brother, shot the victim, and then fled. After the shooting, he took steps to avoid detection by deleting from his social media account the messages between himself and the victim. It appeared he acted alone and there was no evidence he was influenced or coerced by anyone else. The court also noted C.S. had a history of repeatedly and illegally possessing firearms. It acknowledged the trauma he was exposed to in his childhood but ultimately found the degree of criminal sophistication was high and "an aggravating factor."

*Gravity and circumstances of the charged offense.* The court described the charged offense in some detail, and noted, "There is no more serious crime than the murder of an individual." It also noted that, in this particular case, C.S. was the shooter, and "[i]t was utterly senseless and especially callous to lure the victim to a planned armed robbery and shoot [him] after having absolutely no intention to the pay for the firearm." It found this criterion was "an aggravating factor."

15

*Prior delinquent history.* The court recounted C.S.'s prior delinquent history in some detail. It noted that history began in 2017 when he and another juvenile robbed a 92-year-old woman and pushed her down, and she died 43 days later, and continued up to the 2023 murder charge. It found his history was "very serious" and involved both "violence and repeated possession of loaded firearms." It found his delinquent history "is an aggravating factor but . . . his upbringing, and community environment, and childhood trauma offers some level of mitigation."

*Success of previous attempts by the juvenile court to rehabilitate the minor.* The court noted C.S. entered the juvenile court system when he was 12, and various resources were made available to him and his family. It noted C.S. and his father acknowledged he participated in counseling for approximately one year when he was 14. It also noted he was given the opportunity to participate in wraparound services, but he failed to consistently engage in the services offered, and he was offered mental health services from the wraparound team but declined to participate. It found the previous attempts at rehabilitation were not successful, as evidenced by C.S.'s continued criminal behavior. Finally, it noted C.S. had been in custody for over two years since the murder, he was living in a structured environment and was participating in programming, yet he continued to display "violent, manipulative, and aggressive behavior towards peer[s] and staff. [¶] Despite efforts to rehabilitate [C.S.], his continued criminal behavior and demonstrated unwillingness to change are deemed aggravating."

*Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction.* The court reiterated that C.S. had been in custody since his arrest on the current charges but continued to display aggressive and violent behavior. He had been the subject of over 75 incident reports, which described "acts of disrespect, disruption, attempting to intimidate and threaten staff, noncompliance, gang related physical altercations, inappropriate comments, pressuring other residents to fight, and repeated acts of violence." Perhaps most concerning, shortly before the transfer hearing,

16

he attacked another resident, which resulted in the filing of a case in adult criminal court. The court acknowledged Dr. Murphy's opinion that C.S. could be rehabilitated, but it noted she had only spent 90 minutes over Zoom with him, and she did not sufficiently take into account "the excessive instances of continued violence, manipulation, and aggression that have continued" in detention. It also noted, "prior actions can certainly predict future conduct," and although Dr. Murphy opined C.S. could change, his "ongoing violence, threats, and criminal behavior" while detained demonstrated "the opposite is true."

Taking all these criteria into consideration, the juvenile court concluded the prosecution met its burden of proving C.S. is not amenable to rehabilitation while under the jurisdiction of the juvenile court.

## DISCUSSION

*Standard of Review*

"We review the juvenile court's ruling on a transfer motion for abuse of discretion. [Citation.] 'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' [Citation.] The juvenile court's findings with respect to each of section 707's five criteria are findings of fact reviewed for substantial evidence. [Citation.] . . . [Citation.] [¶] Likewise, we review for substantial evidence the juvenile court's ultimate finding 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' [Citation.] Because the juvenile court must make that finding by clear and convincing evidence, we 'determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard. [Citation.]" (*Miguel R., supra*, 100 Cal.App.5th at p. 165.) "In conducting substantial

17

evidence review, we draw all reasonable inferences in support of the court's findings, not against them. [Citation.] We consequently are concerned only with whether ' " 'the circumstances reasonably justify the trier of fact's findings.' " ' [Citation.] When evidence reasonably justifies the trier of fact's findings, ' "the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*Id*. at p. 169.)

*The Court's Ex Parte Contact with the Sheriff's Department*

C.S.'s first argument is that the juvenile court committed prejudicial error by engaging in an ex parte communication with the sheriff's department about how he was performing in county jail.

After the hearing on the transfer motion ended, the court took the matter under submission. At the hearing at which it was scheduled to announce its decision, the court stated it had not yet finished reviewing all the exhibits and would announce its ruling in a few days. It also stated for the record, "I did ask the sheriff's department to advise me of . . . how [C.S. has] been doing at the jail. And they did put together a summary for me. I have shared that with both attorneys." It appears the summary consisted of a document that described five incidents involving C.S. in the county jail (the summary is not part of the record on appeal).

C.S.'s counsel objected that it was improper for the court to seek and consider this information because it was not part of the record and some of the incidents had occurred after the transfer hearing had concluded. The court responded, "I can appreciate the argument that some of this conduct occurred after the hearing was concluded. I will say that the Court will not be taking any of this into account. [¶] As I previously indicated, I've already been working on my ruling. And this will not change anything. But because the Court did have the information, I wanted to make sure that I shared it with all the parties."

18

At a hearing held several days later, the court announced its decision granting the motion to transfer. After the court announced its decision, C.S.'s counsel again objected to what counsel characterized as the court having ex parte communications with the sheriff's department, investigating the case on its own, and engaging in advocacy for the prosecution. Counsel also noted C.S. had not been given an opportunity to provide this new information to C.S.'s expert or to examine anyone about it. Counsel argued the court's actions constituted misconduct and violated C.S.'s due process rights and the Code of Judicial Ethics. The court confirmed it "did ask the sheriff's department for information . . . in order to have a complete picture of [C.S.'s] behavior during the time that he has been in custody since the murder." It then noted it "agreed that it would not consider any of these incidents, and in fact did not consider any of these incidents in reaching the ruling that [it] has issued today." It also noted, "it is the Court's position that the Court did not engage in any advocacy and instead disregarded the information [provided] by the sheriff's department."

As C.S. accurately notes, canon 3 of the Code of Judicial Ethics provides, "Unless otherwise authorized by law, a judge shall not independently investigate facts in a proceeding and shall consider only the evidence presented or facts that may be properly judicially noticed." (Cal. Code Jud. Ethics, canon 3(B)(7).) It also provides, "A judge shall not initiate, permit, or consider ex parte communications, that is, any communication to or from the judge outside the presence of the parties concerning a pending or impending proceeding, and shall make reasonable efforts to avoid such communications." (*Ibid*.) C.S. argues the juvenile court violated both of these prohibitions by contacting the sheriff's department without notice to the parties to request information about C.S.'s behavior in jail.

19

Assuming for the sake of argument that the court's conduct violated these prohibitions,[10] as C.S. implicitly acknowledges, such a violation requires reversal only if prejudicial. (See, e.g., *People v. Abel* (2012) 53 Cal.4th 891, 914 [to obtain reversal for judicial misconduct the defendant "must establish prejudice"]; *People v. Williams* (2021) 60 Cal.App.5th 191, 206 ["When a trial court commits judicial misconduct, we apply the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 to determine whether the misconduct is prejudicial"].) In order to establish prejudice in the context of this case, C.S. would have to show the juvenile court considered or somehow relied on the information it obtained from the sheriff's department in making its decision. In *Mathew Zaheri Corp. v. New Motor Vehicle Bd.* (1997) 55 Cal.App.4th 1305, for example, the court held an ex parte communication between an administrative law judge and one party's counsel violated the law of legal ethics but did not warrant reversal unless the judge relied on or considered it when making its findings. (*Id.* at p. 1315.) Similarly, it held the "ex parte 'receipt of evidence' violates due process" only if the decision maker "*used* the illicit information in reaching its decision." (*Id.* at p. 1319; see also *In re Iris R.* (2005) 131 Cal.App.4th 337, 343 [due process error generally "would not per se warrant a reversal, but rather is subject to a harmless error analysis" and the defendant "must show that any violation . . . resulted in prejudice"].)

In this case, however, the court stated several times that it would not and did not consider the information it received from the sheriff's department in reaching its decision. C.S. has given us no reason to doubt the veracity of the court's statements. He argues

_____

**10** We note the advisory committee comments to canon 3 expressly state, "A sentencing judge may not consult ex parte with a representative of the probation department about a matter pending before the sentencing judge." (Advisory Com. com., Cal. Code Jud. Ethics, foll. canon 3B(7)(a).) We believe the same reasoning would prohibit a juvenile court from consulting ex parte with a representative of the sheriff's department about a matter pending before it.

only that "the absence of substantial evidence supporting the transfer decision establishes that although the juvenile court may have stated that it disregarded the independently sought evidence, the court likely did, to some degree, rely on this information in reaching its determination." We find such speculation is insufficient to show prejudice, and we proceed to discuss his argument that the transfer decision is not supported by substantial evidence.

*Substantial Evidence Supports the Transfer Decision*

We note at the outset that C.S.'s arguments on the merits are not always easy to understand. Although it is clear C.S. challenges the court's findings and conclusions regarding some of the criteria specified in section 707, it is not entirely clear which criteria he challenges. Appellate courts are not mind readers, and we thus cannot, and do not, address arguments that may be lurking within a brief but that are not clearly stated or identified. (See, e.g., *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 (*Allen*) ["It is the responsibility of the appellant . . . to support claims of error with meaningful argument and citation to authority. [Citations.] When legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration"].)

For example, in his opening brief, C.S. does not mention the "previous delinquent history" criterion (§ 707, subd. (a)(3)(C)(i)), other than to note in passing that the juvenile court found he "had a concerning criminal history." In his reply brief, he acknowledges, "the serious nature of [his] delinquency past . . . is not necessarily in controversy." Because he does not clearly and directly challenge the juvenile court's finding that his previous delinquent history was an aggravating factor and weighed in favor of transfer, we will assume that finding is supported by substantial evidence and we do not address it further. (See *Allen, supra*, 234 Cal.App.4th at p. 52.)

C.S. also does not expressly mention the "circumstances and gravity of the offense alleged" criterion. (§ 707, subd. (a)(3)(E)(i).) We could thus simply assume he does not

challenge the juvenile court's finding that this criterion weighs in favor of transfer and decline to address it further. (*Allen, supra*, 234 Cal.App.4th at p. 52.) We note, however, that he does cite *J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, and, in particular, the portion of that case where the court discusses the gravity of the charged offense criterion, and he asserts this case is similar, albeit with little analysis or discussion. The crime in *J.N.* is described as follows: "J.N. and two other minors . . . were tagging (making graffiti) in a rival gang's claimed territory. The killing occurred when the three minors were surprised by an adult rival gang member. The rival approached S.C., who pulled out a gun to scare the man. Undeterred, the man grabbed the gun in S.C.'s hand and a struggle ensued. Shots were fired as they wrestled over the gun. J.N. and the other minor stood frozen nearby." (*J.N.*, at pp. 711-712, fn. omitted.) It was undisputed J.N. was not the shooter. (*Id*. at p. 711.) The juvenile court expressly made numerous mitigating findings about the crime and J.N.'s participation in it. For example, it found the murder was not sophisticated, was not planned, and was " 'just something that happened while they were writing on the wall.' " (*Id*. at p. 723.) It also found the shooting would not have happened "had the gang rival not aggressively approached S.C., grabbed the gun, and attempted to take it from S.C." (*Ibid*.) It also found the shooting was " 'unexpected' " to J.N., and it stated, " 'what was going on in his mind at the time of the actual shooting . . . come[s] down in favor . . . of finding suitability,' " (i.e., to treatment in juvenile court). (*Ibid*.) Finally, it found this particular murder was on " 'the low end of the scale' " in terms of gravity. (*Ibid*.) It nonetheless found the gravity of offense factor favored a finding of unsuitability because a crime " 'doesn't get much more serious than this when you have an unarmed person shot and killed.' " (*Id*. at p. 724.) Given the juvenile court's "considerable factual findings mitigating the gravity of the offense," the appellate court stated, "We cannot say substantial evidence supports the court's finding J.N. was not suitable for juvenile court treatment based on the gravity of the offense." (*Ibid*.)

Factually, this case is nothing like *J.N.* C.S. was alleged to be the shooter and the juvenile court made no findings mitigating the gravity of the offense. As even C.S. admits, the evidence is sufficient to demonstrate he "may have harbored the intent to rob" the victim. The evidence is also sufficient to demonstrate that C.S. armed himself, lured the victim away from his vehicle and his brother, and directed him further into the apartment complex in order to effectuate the robbery, where he then shot and robbed the victim. This is sufficient to support the juvenile court's finding that the circumstances and gravity of offense was an aggravating factor and favored transfer. The only argument C.S. offers to the contrary is his assertion that there was no evidence suggesting he harbored any intent to kill the victim (as opposed to an intent to rob him). Not so. Purposeful use of a lethal weapon permits an inference of intent to kill. (See *People v. Smith* (2005) 37 Cal.4th 733, 741 [" 'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill" ' "]; *People v. Arias* (1996) 13 Cal.4th 92, 162 ["if the jury found defendant's use of a lethal weapon with lethal force was purposeful, an intent to kill could be inferred, even if the act was done without advance consideration"].)

As for the "criminal sophistication" criterion (§ 707, subd. (a)(3)(A)(i)), C.S. challenges the juvenile court's finding that he exhibited a high degree of criminal sophistication, largely by pointing to Dr. Murphy's opinion that he was not criminally sophisticated.[11] The question, however, is not whether there is some evidence that C.S.

---

[11] In Dr. Murphy's opinion, C.S.'s criminal behavior was a product of his traumatic and dysfunctional upbringing rather than criminal sophistication. She also testified she thought the shooting was criminally unsophisticated because C.S. failed to take effective steps to ensure he was not identified and "a witness [i.e., the victim's brother] was not pursued. They were left as a witness." In other words, a sophisticated criminal would not have been caught and would have shot the witness as well. The fact that a crime is poorly or ineptly executed does not make it unsophisticated. (See, e.g., *People v.*

lacked criminal sophistication; the question is whether the evidence supports the court's finding he exhibited a high degree of criminal sophistication. As noted above, "the existence of contrary evidence does not show that the trial court's findings were not supported by substantial evidence." (*Miguel R., supra*, 100 Cal.App.5th at p. 169.) The evidence regarding the current charges and the prior firearm charges (i.e., the police reports, petitions, and court records) supports the court's finding that C.S. exhibited a high degree of criminal sophistication before, during, and after the shooting, and in his escalating willingness to obtain, carry and use firearms. (See, e.g., *People v. Superior Court (Jones), supra*, 18 Cal.4th at pp. 683-684 [reversing juvenile court's finding the minors were criminally unsophisticated where evidence showed they planned a robbery in considerable detail; obtained a gun, masks, and gloves; selected their target with care; and took steps to avoid detection after the robbery].)

C.S. also mentions the two criteria regarding rehabilitation ("[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" and the "success of previous attempts by the juvenile court to rehabilitate the minor") and the juvenile court's overall conclusion that he "is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3)(B)(i), (a)(3)(D)(i), (a)(3).) His arguments about these criteria, however, are not clear. For example, he notes in passing that the court found he had been in the juvenile justice system since he was 12 years old, but he had failed to reform or take advantage of the various services offered to him. It does not appear C.S. challenges these findings (and in any event, they are supported by

*Superior Court (Jones)* (1998) 18 Cal.4th 667, 683-684 [reversing juvenile court's finding the minors were criminally unsophisticated where evidence showed they planned the offense in considerable detail and "[t]he fact that they were 'inept' and did not elude arrest . . . does not constitute substantial evidence to support a finding that their conduct was 'unsophisticated' "].) As occurred here, the juvenile court was free to draw a different conclusion from the underlying facts.

the evidence). Instead, it appears he challenges the court's finding that his failure to reform demonstrated an "unwillingness to change."

The court made the "unwillingness to change" comment when discussing the "success of previous attempts by the juvenile court to rehabilitate the minor" criterion (§ 707, subd. (a)(3)(D)(i)). The court made the comment after noting that, since the current charges were filed, C.S. had been in the structured environment of the youth detention facility for two years, had participated in the programming offered, and had thus had "ample opportunity to demonstrate growth and maturity as he claims he has acquired, and instead has continued with violent, manipulative, and aggressive behavior towards peer[s] and staff." The court then stated, "Despite efforts to rehabilitate [C.S.], his continued criminal behavior and demonstrated unwillingness to change are deemed aggravating."

C.S. does not directly challenge these findings and instead notes only this "point of view however does not adequately take into consideration the evidence presented during the hearing." In particular, he notes Jacobs testified he had been modeled and exposed to violence his entire life and had not had a "meaningful opportunity [for] treatment," and Dr. Murphy testified (1) exposure to stress and traumatic events "can slow the process of prefrontal cortex development," (2) someone who is "mired in this very emotional trauma state" is "more likely to be impulsive, emotionally dysregulated, and angry," (3) changing "patterns of conduct" that have "become overlearned over time" is a "slow[]" and "long[]" process, and (4) "[i]t's much easier to give in to one's base instincts and just take what you want. It's harder to inhibit impulses, think about the consequences of your choices, and to make the right choice." None of this testimony, however, demonstrates the juvenile court's findings are not supported by substantial evidence. Again, "the existence of contrary evidence does not show that the trial court's findings were not supported by substantial evidence." (*Miguel R., supra*, 100 Cal.App.5th at p. 169.)

C.S. notes he was incompetent for much of his time in the juvenile justice system. This is true, but he fails to explain either why this is relevant or how it demonstrates any of the juvenile court's findings are not supported by substantial evidence. His point may be that the services he was provided from approximately 2017 to 2019, when he was incompetent, were focused on competency restoration and not on rehabilitation, because he cites Dr. Murphy's testimony that competency restoration and rehabilitation are "apples and oranges." Again, however, he fails to explain how this undermines any of the juvenile court's findings, which were not focused on the services he received while incompetent.

Relatedly, C.S. also appears to argue it was not appropriate to consider evidence that he failed to avail himself of services when he was between the ages of 12 and 15, because, as Dr. Murphy opined, "It was incumbent on the juvenile court system and its agents to ensure [his] participation."[12] Even if we assume this is true, it ignores the fact that the juvenile court did not focus on these early attempts at rehabilitation. Instead, it focused on his continued violent behavior in juvenile hall despite participating in programming and living in a structured environment. It also ignores the fact that the court was *required* to consider previous attempts at rehabilitation. (§ 707, subd. (a)(3)(D)(i).)

---

[12]    We acknowledge there may have been times when C.S.'s failure to take advantage of services was due to circumstances beyond his control. For example, particularly when he was younger, C.S. had to rely on his father to take him to therapy, and it appears his father was often unable to do so. But there is also evidence that C.S. failed or declined to participate in services when he was older. For example, C.S. was referred to wraparound services in 2022 following his second adjudication for possession of a firearm, but the provider reported he "often missed scheduled appointments due to having strong ties out of town." The provider also reported it "attempted to open IFS mental health services, but youth declined services."

C.S contends that the juvenile court was discouraged by the absence of a finding by Dr. Murphy that C.S. could rehabilitate under juvenile court jurisdiction and argues that Dr. Murphy did in fact so opine. This does not accurately represent what the juvenile court actually found. In the cited portion of the court's decision, the court noted, "Dr. Murphy's professional opinion was that [C.S.] could rehabilitate prior to age 25," which directly contradicts C.S.'s assertion that the court relied on "the absence of a finding by Dr. Murphy that [he] could rehabilitate under juvenile court jurisdiction." The court went on to state, "However, she [i.e., Dr. Murphy] could not and did not say that [C.S.] has made any changes to date. In fact, the opposite is true. [C.S.] told Dr. Murphy he wants to change, but then continued with ongoing violence, threats, and criminal behavioral even when he knew this case was going to a transfer hearing." C.S. never addresses this finding, much less demonstrates it is not supported by substantial evidence.

C.S. states the juvenile court was "concerned that Dr. Murphy spent only ninety remote minutes with [C.S.], which the court found to be insufficient." The court did note—accurately—that Dr. Murphy "spent only 90 minutes with [C.S.] over Zoom and never met him in person." However, the court did not state this was insufficient,[13] and, perhaps more importantly, it went on to note that although Dr. Murphy opined C.S. is amenable to treatment, she "did not take into account the excessive instances of continued violence, manipulation, and aggression that have continued for a period of nearly two years while in custody ultimately resulting in the filing of an adult case based on the violent and unprovoked assault of another resident at the Youth Detention Facility." Again, C.S. does not address this finding, much less demonstrate it is not supported by substantial evidence. Reviewed in context, it appears to us that what concerned the juvenile court was not how long or how Dr. Murphy interviewed C.S., but

---

[13] Although the implication is that this fact may have lessened the persuasiveness of Dr. Murphy's opinion.

27

her failure to account for his continued violent behavior in juvenile hall, up to and including the assault that led to criminal charges being filed on the eve of the transfer hearing.

C.S. quotes the following two propositions from *Krause v. Apodaca* (1960) 186 Cal.App.2d 413, 417:  (1) " 'testimony which is not inherently improbable and is not impeached or contradicted by other evidence should be accepted as true by the trier of fact,' " and (2) " ' "the uncontradicted testimony of a witness to a particular fact may not be disregarded, but should be accepted as proof of the fact." ' "  He does not discuss how either proposition is relevant to this case, and "citing cases without any discussion of their application to the present case results in forfeiture." (*Allen, supra*, 234 Cal.App.4th at p. 52.)  To the extent he contends *Krause* demonstrates the juvenile court was required to accept all of Dr. Murphy's opinions about C.S.'s amenability to rehabilitation because they were uncontradicted, we disagree for two reasons.

First, Dr. Murphy's opinion that C.S. was amenable to rehabilitation was not uncontradicted.  Instead, it was contradicted by the documentary evidence introduced by the prosecutor, including the evidence that:  (1) after C.S. admitted a firearms charge in 2021 he was placed on probation, but he was arrested just six months later on multiple firearms charges; (2) shortly after he admitted a second firearms charge in early 2022, he violated the terms of his probation by leaving home without permission; (3) in late 2022 he was referred to wraparound services, but failed to consistently engage and declined mental health services, and shortly thereafter he shot Salvadore Doe; and (4) despite being detained for two years in a structured environment with programming available to help him make better choices he continued to engage in violent behavior up to and including an assault that resulted in the filing of a felony complaint in adult criminal court.  As the court noted when explaining its finding that C.S. is not amenable to rehabilitation, "prior actions can certainly predict future conduct," and case law supports this.  (See, e.g., *In re Shaputis* (2011) 53 Cal.4th 192, 219 ["Past criminal conduct and

current attitudes toward that conduct may both be significant predictors of an inmate's future behavior"]; *Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 903, fn. 2 [collecting cases that recognize past conduct is predictive of future behavior].)  The court then reiterated that, since his detention, and despite telling Dr. Murphy he wants to change, he continued "with ongoing violence, threats, and criminal behavior even when he knew this case was going to a transfer hearing."  In other words, on the eve of his scheduled transfer hearing, C.S. attacked a fellow detainee, which led to the filing of a felony complaint in criminal court.  We cannot say the juvenile court abused its discretion in finding this demonstrated an unwillingness to change and was a "significant predictor[]" that he was not amenable to rehabilitation.  (*In re Shaputis*, at p. 219.)

Second, and *Krause* notwithstanding, more recent case law teaches that " 'expert testimony, like any other, may be rejected by the trier of fact, so long as the rejection is not arbitrary.' " (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 632.)  "Although a [finder of fact] may not arbitrarily or unreasonably disregard the testimony of an expert, it is not bound by the expert's opinion.  Instead, it must give to each opinion the weight which it finds that opinion deserves.  So long as it does not do so arbitrarily, a [finder of fact] may entirely reject the testimony of a [party's] expert, even where the [opposing party] does not call any opposing expert and the expert testimony is not contradicted." (*Id.* at p. 633; see also *Conservatorship of McKeown* (1994) 25 Cal.App.4th 502, 507 [finder of fact "is not bound by an expert opinion and may reject it if it is not believable"]; *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043 ["[a] trier of fact is free to disbelieve a witness, even one uncontradicted, if there is any rational ground for doing so"].)  We find nothing arbitrary about the juvenile court's rejection of Dr. Murphy's opinion that C.S. is amenable to rehabilitation.

Finally, C.S. writes, "The record on appeal provides the Court with ample evidence to support a finding that during the course of these previous years, [C.S.] was inadequately supported in these attempts at rehabilitation."  As an appellate court,

however, it is not our job to make findings in the first instance.  Instead, our job is to determine whether the findings made by the juvenile court are supported by substantial evidence.  And as noted above, "In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings, not against them.  [Citation.]  We consequently are concerned only with whether ' " 'the circumstances reasonably justify the trier of fact's findings.' " ' [Citation.]  When evidence reasonably justifies the trier of fact's findings, ' "the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*Miguel R., supra*, 100 Cal.App.5th at p. 169.)  Here, the evidence reasonably justifies the juvenile court's ultimate finding that C.S. is not amenable to rehabilitation while under its jurisdiction.

### DISPOSITION

The juvenile court's decision transferring C.S. to adult criminal court is affirmed.


_____/s/_____
EARL, P. J.


We concur:


_____/s/_____
HULL, J.


_____/s/_____
FEINBERG, J.